# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DANIEL KOCH, ) | |
| ) | |
| Plaintiff, ) | Case No. 12-cv-1224 |
| ) | |
| v. ) | Judge Robert M. Dow, Jr. |
| ) | |
| VILLAGE OF SCHILLER PARK, an ) | |
| Illinois Corporation; DANIEL SCHULZE, ) | |
| in his capacity as Chief of Police of the Village ) | |
| of Schiller Park, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is a motion for summary judgment [31], filed by Defendants Village of Schiller Park and Daniel Schulze. For the reasons stated below, the Court denies Defendants' motion. This case is set for status hearing on 7/10/2014 at 9:00 a.m.

## I. Background

### A. Statement of Facts

The Court has taken the relevant facts from the parties' Local Rule ("L.R.") 56.1 statements. Local Rule 56.1 sets out the procedures by which parties are to put facts before the Court for consideration at summary judgment. The Rule requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The rule permits a movant to file up to 80 separately-numbered statements of undisputed facts. L.R. 56.1(a)(3). The Rule also requires the non-movant to file a concise response to a movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials," (L.R. 56.1(b)(3)(A)), and to file up to 40 additional separately-numbered

facts (L.R. 56.1(b)(3)(C)). The Rule then permits the movant to submit a concise reply to the opposing party's additional material facts in the same form as prescribed by L.R. 5.1(b)(3)(A).

Consistent with these directives, Defendants filed 27 statements of fact along with their summary judgment motion, to which Plaintiff responded pursuant to Section (b)(3)(A) of the Rule. Plaintiff also filed 35 additional facts, as prescribed by Section (b)(3)(C) of the Rule, and Defendants replied in kind. Regrettably, however, Defendants did not adhere to the Rule in the body of their motion itself, citing numerous facts not contained in the 56.1 statements. As Plaintiff argues, this is an impermissible method by which to set out facts at summary judgment and is insufficient to put issues before the Court. *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995); *Malec v. Sanford*, 191 F.R.D. 581, 594 (N.D. Ill. 2000). For that reason, and because of Defendant's disregard of the Court's prior Order on this precise issue, the Court will not excuse Defendants' neglect of the Rule.

Defendants first filed a motion for summary judgment in this case on April 19, 2012. See [7]. The Court, however, struck Defendants' motion without prejudice for failure to conform to Local Rule 56.1 and provide a separate statement of facts along with their motion. See [18]. The Court took the time in its Order to describe the import of L.R. 56.1, made explicitly clear that strict adherence is required, and cited numerous cases (many of the same ones that the Court cites below) explaining the consequences of non-compliance. *Id.* Even more remarkable than Defendants' failure to comply with the Rule this time around is the final section of their reply brief, which argues that Plaintiff misinterprets the Rule and insists that L.R. 56.1 does not require a movant to include *all* material facts in a separate statement of facts. See [35] at 10. At this point, the Court has been more than charitable with Defendants, striking their initial motion without prejudice to refiling and providing ample forewarning as to the result of noncompliance

2

with the Rule. Defendants must now live with the consequences of their own shortcomings.

Here, Plaintiff had no duty (or opportunity, in light of the Rule) to respond to Defendants' extraneous fact statements. And the Seventh Circuit has stressed that it is not the role of the Court to parse the parties' exhibits to construct the facts to determine whether or not there is a genuine factual dispute. Judges are not "like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991). "Nor are they archaeologists searching for treasure." *Jeralds ex rel. Jeralds v. Astrue*, 2010 WL 4942161, at *7 (N.D. Ill. Dec. 8, 2010) (citing *DiLeonardi,* 181 F.3d 865, 867 (7th Cir. 1999)). It simply is not the court's job to sift through the record to find evidence to support or oppose a party's claim. *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006). Rather, it is "[a]n advocate's job . . . to make it easy for the court to rule in his client's favor . . . ." *Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 613 (7th Cir. 2006). The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013); see also *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (noting that the Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1."). Therefore, the Court will only consider the statements contained in the parties Rule 56.1 statements. Material facts cited for the first time in Defendants' motion for summary judgment – namely, all citations to Exhibit J (Schulze's deposition transcript) and Exhibit K (Schulze's affidavit), with the sole exception of ¶ 14 in Exhibit K, which Defendants cite in their statement of facts[1] – will be disregarded.[2]

---

[1] To be clear, though, Defendants citations to portions of Exhibits J and K in their reply to Plaintiff's additional facts will be considered in determining whether genuine issues of material fact exist. The Rule permits the moving party to "submit a concise reply in the form prescribed in [section (b)]. All material

3

B.    Facts

Plaintiff Daniel Koch joined the Village of Schiller Park Police Department in 1986. Pl. Resp. to Def. SOF ¶ 7. At the conclusion of the two-year probationary period that followed Koch's hiring, he was certified as a member of the Department "with the permanent rank of Patrolman." *Id.* at ¶ 9. Schiller Park's Police Department is divided into two divisions: a patrol division and a detective division. *Id.* at ¶ 14. No matter his division, though, a member of the police department is formally classified as a "patrolman." *Id.* at ¶ 15. The Police Chief, responsible for the direction and performance of all department functions, assigns the department's patrolmen at his discretion to either the patrol or detective division. *Id.* at ¶ 16-17. But promotions within the police department are governed by the Rules and Regulations of the Board of Fire and Police Commissioners. *Id.* at ¶ 13.

On May 4, 1998, Koch was assigned by former-Police Chief Peter Puleo as a Community Policing Officer. *Id.* at ¶ 10. In December 2001, Koch was moved into the Detective Division by then-Police Chief Robert Radak. *Id.* at ¶ 19. The parties disagree over the characterization of this move; Koch describes the switch to detective as a "promotion," while Defendants insist that Koch was merely "reassigned" to his new role. *Id.* Regardless of the appropriate term, the parties agree that Koch's switch to detective was not governed by the department's Rules and Regulations concerning promotions – Rules 4-21 through 4-35. *Id.* at ¶ 20. And regardless of how the job change is characterized, Koch's rank (Patrolman) remained the same. *Id.* at ¶ 21, 30.

---

facts set forth in the statement filed [by the non-movant] pursuant to section (b)(3)(c) will be deemed admitted unless controverted by the statement of the moving party."

[2] Plaintiff urges the Court to disregard Defendants' references to "Exhibit E" on pages 8 and 9 of their motion, as well, arguing that Defendants failed to cite to Exhibit E in their statement of facts. The Court notes, however, that Defendants did cite to Exhibit E, the Rules and Regulations of the Board of Fire and Police Commissioners, in statement of fact no. 12, and the specific regulations at issue in fact no. 13. As such, the Court will not strike references to Exhibit E in Defendants' motion.

Koch asserts that along with his new title came a salary increase, additional pension contributions, an end to weekend work, increased schedule flexibility, and the ability to wear "plain clothes" on the job and drive an unmarked car. Def. Reply to Pl. SOF ¶ 2. Defendants dispute that Koch received increased pension benefits and contend that detectives receive a $200 stipend each month that non-detectives do not receive (a fact which may or may not be intended to refute Koch's claim of a salary increase). *Id.*

In January 2006, Koch had a heart attack. Pl. Resp. to Def. SOF ¶ 22. After a brief absence from work, Koch returned to "light duty" until his doctor cleared him to return to full duty as a detective without restriction, which he did on March 20, 2006. *Id.* at ¶ 23-25; Def. Reply to Pl. SOF ¶ 4. Koch remained a detective with the Schiller Park Police Department for almost five more years until January 2011, when he was reassigned (as Defendants characterize it) to the patrol division by Police Chief Daniel Schulze. Pl. Resp. to Def. SOF ¶ 28. Again, though, Koch's rank remained – as it had always been – that of "patrolman." *Id.* at ¶ 29-30.

Koch contends that Chief Schulze demoted (Koch's verb) him from the detective division to the patrol division because of his heart condition. *Id.* at ¶ 17. Koch maintains that, upon his return to work in March 2006, he informed his superiors that he had coronary artery disease, and that he spoke with Schulze about his heart attack four or five times prior to his January 2011 transfer from detective to patrol division. Def. Reply to Pl. SOF ¶ 4-5. Moreover, Defendants concede that Schulze was aware of two subsequent heart-related incidents that Koch experienced. *Id.* at ¶ 6. During the first, Schulze walked Koch to an ambulance after Koch complained of chest pains. *Id.* And Schulze was informed of Koch's second episode, which occurred during the Spring of 2009, after Koch was again taken by ambulance to the hospital, where Koch was informed that his blood pressure was "extremely high." *Id.*

On April 7, 2010, Koch testified at a worker's compensation arbitration hearing about his 2006 heart attack. *Id.* at ¶ 8. During the arbitration, Koch testified (a) that his duties as a detective are very stressful and (b) that the duties of detectives are more stressful than those of patrolmen. *Id.* Schulze was appointed Police Chief around December 15, 2010. *Id.* at ¶ 15. In January 2011, about a month later, Schulze called Koch into his office, where – in the presence of their colleague Detective Henn – Schulze told Koch that he had been provided a copy of the transcript from Koch's arbitration hearing. *Id.* at ¶ 8, 16. According to Koch, Schulze informed him that his testimony about the stressfulness of his job "put [Schulze] in a damning position," and, consequently, Schulze said: "I'm taking you out of detectives and putting you in patrol so your job is less stressful." *Id.* at ¶ 17, 35. Koch understood Schulze to be saying that, based on Koch's testimony, Schulze believed that Koch's weak heart could not handle the stress of being in the detective unit. *Id.* at ¶ 17. For that reason, Koch contends, Schulze – without referring to Koch's medical records or doctor notes – moved Koch from the detective unit to the patrol division. *Id.* at ¶ 28-29. According to Schiller Park Police Sergeant William Strieby, just minutes before the January 2011 meeting, Schulze asked Strieby if he had read Koch's arbitration transcript. *Id.* at ¶ 30. When Strieby acknowledged that he had, Schulze told Strieby that he thought Koch "perjured himself" and asked rhetorically, "what would Leslie do?" *Id.* at ¶ 31-33. Strieby understood the question to mean: what would Koch's wife, Leslie, do if something happened to her husband? *Id.* at ¶ 33.

According to Koch, his transition to the patrol division decreased his pay, reduced his pension benefits, changed his title from "detective" to "officer," returned him to a uniform from street clothes, and required him to drive a marked car and work weekend shifts. *Id.* at 20. Additionally, it became more difficult for Koch to earn overtime pay, since patrolmen do not

6

earn overtime until they complete a 12-hour shift, whereas detectives begin earning overtime at the completion of an 8-hour shift. *Id.* at ¶ 21. And, Koch contends, only detectives act as the lead investigators on cases, handle crime scenes, and consult with state's attorneys on approval of felony charges. *Id.* (Defendants dispute Koch's use of the word "only," and maintain that a patrolman may sometimes lead a crime scene, depending on the scene's severity. *Id.*)

Defendants tell a different story of what took place in that January 2011 meeting. They maintain that Schulze never told Koch that the reason for his reassignment out of the detective division was his 2006 heart attack. Def. SOF ¶ 32-33. Defendants deny that Schulze made any of the statements that Koch alleges that Schulze made during the meeting, and they deny that Schulze made the alleged statements to Strieby just before the meeting. Def. Reply to Pl. SOF ¶ 35. Further, Defendants insist that Koch's "reassignment" was not technically a demotion, and point out Koch's admission that during the entirety of his career, from 1986 until present, his rank has always been that of "patrolman." Def. SOF ¶ 29. Defendants also note that two other Schiller Park detectives, Robert Izruto and Russ Klug, suffered heart attacks and that neither was reassigned out of the detective division. *Id.* at ¶ 31; Pl. SOF ¶ 24-25. However, the parties agree that Izruto's heart attack occurred in 1998, well before Schulze had authority as police chief to remove him from the detective, and that Klug (whose heart attack occurred between 1998 and 2003) was the Department's "school resource officer," a position that rarely required case investigation or patrol work. Def. Reply to Pl. SOF ¶ 24-25.

In Koch's statement of facts, he adds that Schulze administered Koch's May 2009 performance evaluation, on which he scored a rating of "acceptable" or "superior" in every category except for the "subjective attitude" category. Def. Reply to Pl. SOF ¶ 9. Schulze claims that a complaint by Koch's colleague, detective William Martin, in addition to verbal

7

complaints received from the public, led Schulze to rate Koch's attitude as "unacceptable" in that evaluation.  *Id.* at ¶ 10.  Schulze testified, however, that he considers Koch's 2009 review, on the whole, to be "acceptable."  *Id.* at ¶ 12.  And Detective Martin testified that Koch has a "positive reputation" within the patrol division and that he considers Koch's attitude to be "positive and productive."  *Id.* at ¶ 10-11.

## II. Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation omitted).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]."  *Anderson,* 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs.,* 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary judgment. See *id.* The Court must resolve all evidentiary conflicts in Plaintiff's favor and accord him the benefit of all reasonable inferences that may be drawn from the record. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2013). "It is not for courts at summary judgment to weigh evidence or determine credibility of [a witness's] testimony." *Id.* (quoting *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)). Nevertheless, summary judgment in favor of the defendant "is hardly unknown or, for that matter rare, in employment discrimination cases." *Wallace*, 103 F.3d at 1396.

### III. Discussion

Koch's complaint alleges that Defendants committed three distinct legal violations for which he is entitled to relief. Count I alleges that Defendants violated Title II of the Americans with Disabilities Act by demoting him from the detective division to the patrol division based on a perceived disability. Count II alleges that Defendants violated 42 U.S.C. § 1983 "via the Americans with Disabilities Act" for the same reason. Count III is a *Monell* claim based on Schiller Park's alleged policy of discriminating against persons that it believes to be disabled. Defendants argue that they are entitled to summary judgment on each of these counts.

The Americans with Disabilities Act ("ADA") prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

9

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines discrimination as "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." 42 U.S.C. § 12112(b)(1). And disability is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). "The purpose of the 'regarded as' definition of a 'disability' is to 'cover individuals rejected from a job because of the myths, fears and stereotypes associated with disabilities.'" *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001) (quoting *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489-90 (1999)). To prove his "regarded as" claim, Plaintiff must show either that "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Id.*

In their motion for summary judgment, Defendants suggest that Koch has the burden of establishing a prima facie case of ADA discrimination, and that if he carries that burden, then the burden would shift to Defendants to offer a legitimate nondiscriminatory reason for the employment action taken, which, if done successfully, would flip the burden back to Plaintiff to

show that there is a genuine issue of material fact concerning whether the proffered reason is pretextual. This is a misstatement of the law and the burdens of proof. The Seventh Circuit has been clear that "Federal Rule of Civil Procedure 56 imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary." *Modrowski*, 712 F.3d at 1168 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "[T]he movant's initial burden 'may be discharged by showing – that is, point out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* Upon such a showing, the nonmovant then must "make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* Put another way, the nonmovant must "go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence 'upon which a jury could properly proceed to find a verdict' in [his] favor." *Id.* at 1169 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

In an ADA discrimination case, a nonmovant plaintiff can do this in one of two ways. First, a plaintiff can put forth "direct evidence" of discrimination. See *DeLuca v. Winer Industries, Inc.*, 53 F.3d 793, 797 (7th Cir. 1995). Alternatively, a plaintiff can submit "indirect evidence" of unlawful ADA discrimination by way of the *McDonnell Douglas* burden-shifting rubric, originally established for Title VII cases. *Id.*; *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012) ("[W]e have continued to apply the *McDonnell Douglas* burden-shifting framework in summary judgment cases that proceed under the indirect method of proof . . . ."). Defendants' articulation of the burden-shifting test, therefore, applies only if Koch relies on the indirect method of proof in establishing his discrimination claim. See *id.*; see also *Antonetti v. Abbott Laboratories*, 563 F.3d 587, 591 (7th Cir. 2009) ("Under [the indirect] approach . . . . If Plaintiffs can demonstrate [a prima facie case of discrimination], the burden

shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse action. If [the employer] satisfies this burden of production, Plaintiffs must then establish that there is an issue of material fact as to whether the employer's proffered reasons are merely pretext for unlawful discrimination . . . in order to survive summary judgment.") (internal quotations and citations omitted). But if Koch submits direct evidence of discrimination such that a jury could properly find a verdict in his favor – that is, that genuine issues of material fact exist with respect to each element he will be required to prove at trial – that's the end of the inquiry, and Defendants' summary judgment motion must be denied. See *Bunn v. Khoury Enterprises, Inc.*, ---F.3d---, 2014 WL 2198557, at \*5 (7th Cir. May 28, 2014).

Defendants argue that they are entitled to summary judgment on the two discrimination counts because, they contend, Koch cannot prove that he suffered an adverse employment action. As a backstop, they argue that, even if Koch did suffer an adverse employment action, the action was the result of poor job performance rather than because of a perceived disability. Finally, Defendants argue that Koch cannot prove his *Monell* claim, contending that he has failed to produce any evidence of a custom, policy, or practice by Schiller Park of discriminating against those with actual or perceived disabilities.

### A. Adverse Employment Action

The Seventh Circuit has defined adverse employment actions "quite broadly." *Oest v. Ill. Dept. of Corr.*, 240 F.3d 605, 612 (7th Cir. 2001) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)). However, "adverse actions must be materially adverse to be actionable, meaning more than a 'mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). A "materially adverse change might be indicated by a termination of employment, a demotion

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* (quoting *Smart*, 89 F.3d at 441).

Defendants insist that Koch "cannot possibly prove" that his reassignment from detective to the patrol division was an adverse employment action within the meaning of the ADA, because it is undisputed that Schulze's decision to move Koch to the patrol division did not invoke Rules 4-21 through 4-35 of Schiller Park's "Rules and Regulations of the Board of Fire and Police Commissioners," and therefore, his rank of "patrolman" remained unchanged. Rules 4-21 through 4-35 outline the procedures that must be followed when promoting or demoting an officer (*i.e.*, when changing an officer to an inferior or superior rank). This is the reason that Defendants object to Koch's characterization of his job change as a "demotion" and cling to the term "reassignment." But no matter the label, Koch has highlighted a number of meaningful changes caused by his removal from the detective division, including lower pay, smaller pension contributions, rotating weekend work, the commencement of overtime pay after a 12-hour shift instead of an 8-hour shift, and a relegation from lead investigator on cases to a subordinate role. Koch also complains that, in the patrol division, he could no longer drive an unmarked car and wear plain clothes. Defendants concede that Koch's reassignment came with rotating weekend work and the obligation to wear a uniform and drive a marked car, and that those in the detective division begin to earn overtime after an 8-hour shift while patrolmen cannot earn overtime until a shift's 12-hour mark. And although Defendants attempt to refute Koch's claim that his reassignment resulted in lower pay and decreased pension contributions, Defendants do so mostly with facts that were not included in their L.R. 56.1 statements. As discussed above, the Court will not consider factual assertions from Schulze's deposition transcript, unless they

13

appear in the parties' 56.1 statements. And even if the Court were willing to consider all of Schulze's contradictory claims, his deposition testimony does nothing more than underscore the existence of genuine factual disputes: Koch contends that his pay and pension decreased when he moved to the patrol division, and Schulze disagrees.

Here, a reasonable jury certainly could find that Koch suffered a material adverse employment action. Koch alleges numerous changes to the material conditions and benefits of his employment that resulted from his reassignment. Defendants concede the accuracy of several of Koch's claims and, at most, introduce the existence of a factual dispute on the others. Taking the evidence (that is, Koch's deposition testimony) in the light most favorable to Plaintiff, Koch's removal from the detective division, while perhaps not a technical loss in "rank," resulted in decreased compensation, significantly diminished job responsibilities, and a loss of other material benefits, such as the absence of weekend work and more limited access to overtime pay. Each of these consequences has been recognized by the Seventh Circuit as an example of a materially adverse change in one's employment. See *Oest*, 240 F.3d at 612. For that reason, the Court easily determines that a reasonable jury could find that Plaintiff experienced an adverse employment action within the meaning of the ADA.

### B. Causation

Defendants argue that, even if Koch's reassignment did constitute an adverse employment action, they reassigned him because of poor work performance, not because than a perceived disability. They contend that "Plaintiff has produced no evidence whatsoever that his reassignment was caused by his employer's alleged perception that he was disabled." That contention is contradicted by Koch's deposition transcript, which provides direct evidence in support of his claim. According to Koch, Schulze told him that his testimony at his worker's

compensation hearing about the stressfulness of his job "put [Schulze] in a damning position." Koch says that Schulze explicitly told him: "I'm taking you out of detectives and putting you in patrol so your job is less stressful." Though Schulze denies making these statements, a reasonable jury could credit Koch's testimony and understand Schulze's statements in the same way that Koch did – that Schulze believed that Koch's weak heart could not handle the stress of being in the detective unit and that Schulze was reassigning Koch to the patrol division on account of this perceived disability. In other words, a reasonable jury could conclude that Schulze transferred Koch because Schulze regarded Koch as having a physical impairment that substantially limited a major life activity (a "disability," as defined by 42 U.S.C. § 12102(1)). Although Defendants characterize Koch's deposition statements as "self-serving" (a claim, the Court notes, that equally could be made about Schulze's deposition testimony and affidavit), it is not for the Court to weigh evidence or determine credibility at summary judgment. *Berry*, 618 F.3d at 691. Instead, the Court must resolve all evidentiary conflicts in Plaintiff's favor.

Evidence of discrimination "'is direct when, if believed, it would prove the fact in question without reliance on inference or presumption.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (quoting *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005)). Under the direct method of proof, "a plaintiff can present either direct or circumstantial evidence to meet [his] burden." *Dickerson v. Bd. of Trs. of Cmty Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); *Winsley v. Cook Cnty*, 563 F.3d 598, 604 (7th Cir. 2009) ("Under the "direct method," [Plaintiff] must present direct or circumstantial evidence that creates a 'convincing mosaic of discrimination' on the basis of race."). "But direct evidence, which might take the form of an admission of discriminatory intent by the relevant decisionmaker within the defendant employer's ranks, is understandably rare in ADA cases." *Bunn v. Khoury Enterprises, Inc.*, ---

15

F.3d---, 2014 WL 2198557, at *5 (7th Cir. May 28, 2014). Here, Koch has presented both types of "direct" evidence: a "rare" admission by an employer of his intent, coupled with direct circumstantial evidence. The admission, of course, is presented by way of Koch's testimony concerning the statements that Schulze made to him in their January 2011 meeting. Defendants discount this evidence as self-serving, but Schulze's alleged statements nevertheless are admissions of a party opponent that would be admissible at a trial. On these statements alone a reasonable jury could find that Koch was reassigned because of his heart condition. Moreover, this evidence is accompanied by a slew of circumstantial evidence.

The type of circumstantial evidence that a plaintiff may produce to survive summary judgment under the direct method of proof includes: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reasons for an adverse employment action." *Dickerson*, 657 F.3d at 601. Here, the timing is suspicious in so far as Schulze became Police Chief in December 2010, empowered for the first time with the discretion to reassign officers between divisions, just one month before he removed Koch from the detective division in January 2011. This explains why Schulze did not reassign Koch closer in time to his April 2010 worker's compensation arbitration. Moreover, Sergeant Strieby's affidavit states that, shortly before Schulze's January 2011 meeting with Koch, Schulze asked Strieby if he had read Koch's transcript, suggesting that Schulze had just read it himself and/or had just made the decision to reassign Schulze on its basis. Schulze informed Strieby that he was going to move Koch to the patrol division and asked rhetorically, "what would Leslie do?" Strieby understood Schulze's statement to make reference to Koch's wife, Leslie, and to ask

what she would do if something (*i.e.,* another heart attack) happened to Koch on the job. Schulze's statements to Strieby – again, admissible statements of a party opponent (Schulze) – arguably can be characterized as additional direct evidence of Schulze's discriminatory intent. But at the very least, they are circumstantial evidence that the purported reason Defendants now offer for reassigning Koch (poor job performance) is pretextual.

Defendant's summary judgment motion tries to counteract Koch's evidence with citations to Schulze's deposition transcript and affidavit, none of which they included in their L.R. 56.1 statements or in their responses to Plaintiff's additional 56.1 statements. Again though, by citing to the portion of Schulze's testimony where he denies making the January 2011 statements that Koch alleges, Defendants do nothing more highlight that this is a credibility contest with genuine factual disputes to be decided at trial. Defendants' arguments as to why the Court (and/or a jury) should not find Koch's evidence persuasive achieve that same end. For example, Defendants argue in their reply brief that it was only natural for Schulze to make personnel changes after a month on the job, only then having had the chance to survey his subordinates' strengths and weaknesses. They also argue that the Court should discount Koch's deposition testimony, since he failed to bolster it with corroborating testimony from Detective Henn, who was also present during the January 2011 meeting and whose deposition was not taken. Arguments attacking the weight of Plaintiff's evidence such as these are perfectly legitimate for trial, but they implicitly urge the Court to read the facts in the light most favorable to *Defendants*, which is the opposite of what the Court is required to do at summary judgment. And their attempt to present evidence of Koch's alleged history of poor job performance falls on deaf ears, as they included none of these facts in their 56.1 statements.

As Defendants acknowledge, to survive summary judgment "[P]laintiff must present evidence from which the jury could reasonably find for him." Regardless of whether the Court considers Schulze's claims concerning Koch's past job performance, a reasonable jury – based on the direct evidence that Koch has presented – still could find that Schulze reassigned Koch because of his heart condition. Given that, the Court need not address Defendants' arguments concerning Koch's failure to meet his burden under the indirect method of proof.

Accordingly, the Court denies Defendant's summary judgment motion as to Counts I and II.

### C. *Monell* Claim

To establish municipal liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and its progeny, "a plaintiff must show the existence of an 'official policy' or other governmental custom that not only causes but is the 'moving force' behind the deprivation of constitutional rights." *Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012). "A plaintiff can establish an official policy through '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *Id.* (quoting *Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007)).

In their motion for summary judgment, Defendants make one argument for the dismissal of Plaintiff's *Monell* claim. Defendants argue that "Plaintiff has utterly failed to produce any evidence" of a *Monell* claim, because "an isolated incident of alleged disability discrimination directed only towards him [cannot] amount[] to a custom, policy or widespread practice under *Monell*." Koch makes a single argument in response, contending that Schulze's status as a "final

18

policymaking authority" (that is, the Chief of Police, with the discretion to reassign employees without any higher approval) buoys his claim. Because Defendants fail to address that theory of *Monell* liability in their motion, Koch argues, summary judgment should be denied. Attempting to answer that challenge in their reply brief, Defendants implicitly concede (by their silence) that Schulze is a "final policymaking authority" within the meaning of *Monell*, and instead argue that reassigning Koch cannot support municipal liability because Schiller Park's overarching "policy" governing reassignments is not itself unconstitutional. In Defendants' words: "the reassignment of patrolmen to various divisions within the police department is not only quite common and has been practiced for many years by various Chiefs of Police prior to Schulze's tenure, it is also not an unconstitutional policy." They go on: "There is insufficient evidence to establish that this 'policy' is causally connected to Plaintiff's alleged constitutional deprivation since the record clearly shows that there were other police officers within the Detective Division who also suffered heart attacks but were *not* reassigned out of the division." Defendants miss the mark here.

Koch's allegation is that Schulze's decision to reassign him violated his constitutional rights and subjects Schiller Park to *Monell* liability because, as a final policymaking authority, Schulze was acting on behalf of the municipality when he discriminated against Koch in that way. Defendants seem to confuse and conflate the three ways in which a plaintiff may prove a *Monell* claim, cutting and pasting (without the use of quotation marks) a large section from the 29-year-old Supreme Court case *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), in (as best the Court can tell) an attempt to demonstrate that Koch has failed to allege a widespread unconstitutional "policy" of discrimination. But Koch is expressly advancing the third (not the first or second) theory of municipal liability, and Defendants never actually address either of the

19

two components of Koch's particular brand of *Monell* claim: (1) that a final policymaking authority (2) caused him a constitutional injury. See *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986) (holding that because "*Monell* reasoned that recovery from a municipality is limited to acts . . . which the municipality has officially sanctioned or ordered . . . it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances); see also *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011) (reiterating that "a decision by a municipal agent with 'final policymaking authority' can support municipal liability under Section 1983").

As discussed earlier, Federal Rule of Civil Procedure 56 imposes an initial burden of production on the party moving for summary judgment to inform the Court why a trial is not necessary. *Modrowski*, 712 F.3d at 1168 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). By failing to address either element of Plaintiff's *Monell* claim, Defendants have not carried their initial, minimal burden, and the Court will not make Defendants' arguments for them. For that reason, their motion for summary judgment is denied as to Count III.

## IV. Conclusion

For the reasons stated above, the Court denies Defendants' motion for summary judgment [31]. This case is set for status hearing on 7/10/2014 at 9:00 a.m.

Dated: June 17, 2014

_____
Robert M. Dow, Jr.
United States District Judge